## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**MARCUS VIGIL,**

   **Plaintiff,**

  **vs.**           **Civ. No. 21-100  RB/JFR**

**KILOLO KIJAKAZI, Acting Commissioner,**
**Social Security Administration,**

   **Defendant.**


### PROPOSED FINDINGS AND RECOMMENDED DISPOSITION[1]

 **THIS MATTER** is before the Court on the Social Security Administrative Record (Doc. 20)[2] filed July 19, 2021, in connection with Plaintiff's *Opposed Motion to Reverse and/or Remand,* filed November 19, 2021.  Doc.  28.  Defendant filed a Response on February 17, 2022.  Doc. 32.  Plaintiff filed a Reply on March 3, 2022.  Doc. 33.  The Court has jurisdiction to review the Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383(c).  Having meticulously reviewed the entire record and the applicable law and being fully advised in the premises, the Court finds that Plaintiff's motion is well taken and recommends that it be **GRANTED**.

### I.  Background and Procedural Record

 Plaintiff Marcus Vigil ("Mr. Vigil") alleges that he became disabled on November 1, 2015, at the age of thirty-nine years and four months, because of chronic pain syndrome, lower

---

[1] On February 8, 2021, United States Sr. District Judge Robert C. Brack entered an Order of Reference referring this case to the undersigned to conduct hearings, if warranted, including evidentiary hearings and to perform any legal analysis required to recommend to the Court an ultimate disposition of the case.  Doc. 5.

[2] Hereinafter, the Court's citations to Administrative Record (Doc. 28), which is before the Court as a transcript of the administrative proceedings, are designated as "Tr."

back orthopedics with pain, knee orthopedics with pain, major depression, anxiety disorder, and somatic complaints.  Tr. 93, 236.  Mr. Vigil completed two years of college in 1999.  Tr. 237-245.  He has worked as a landscaper and in yard maintenance.  Tr. 237.  Mr. Vigil stopped working on November 1, 2015, because of his medical conditions.  Tr. 236.

On September 14, 2016, Mr. Vigil filed an application for Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1381 et seq.  Tr. 202-08.  On November 14, 2016, Mr. Vigil's initial application was denied.  Tr. 92, 93-103, 124-27.  On June 6, 2017, Mr. Vigil's application was denied at reconsideration.  Tr. 104-105-117, 130-33.  Thereafter, Mr. Vigil requested a hearing.  Tr. 134-35.  On December 19, 2018, Administrative Law Judge (ALJ) Thomas J. Wheeler held a hearing.[3]  Tr. 33-60.  Mr. Vigil appeared without representation.[4]  *Id.*  On May 21, 2019, ALJ Wheeler issued an unfavorable decision.  Tr. 13-27.  On January 21, 2020, the Appeals Council issued its decision denying Mr. Vigil's request for review and upholding the ALJ's final decision.  Tr. 5-9.  On February 5, 2021, Mr. Vigil timely filed a Complaint seeking judicial review of the Commissioner's final decision.  Doc. 1.

## II.  Applicable Law

### A.    Disability Determination Process

An individual is considered disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The Social Security Commissioner has

---

[3] ALJ Frederick Upshall, Jr., held a hearing on August 21, 2018, at which Mr. Vigil was not represented by counsel. Tr. 61-73.  The hearing was rescheduled so that Mr. Vigil could find representation and obtain additional medical records.  *Id.*

[4] Mr. Vigil is represented in these proceedings by Attorney Benjamin Decker.  Doc. 1.

adopted the familiar five-step sequential analysis to determine whether a person satisfies the

statutory criteria as follows:

> (1) At step one, the ALJ must determine whether the claimant is engaged in "substantial gainful activity."[5] If the claimant is engaged in substantial gainful activity, he is not disabled regardless of his medical condition.

> (2) At step two, the ALJ must determine the severity of the claimed physical or mental impairment(s). If the claimant does not have an impairment(s) or combination of impairments that is severe and meets the duration requirement, he is not disabled.

> (3) At step three, the ALJ must determine whether a claimant's impairment(s) meets or equals in severity one of the listings described in Appendix 1 of the regulations and meets the duration requirement. If so, a claimant is presumed disabled.

> (4) If, however, the claimant's impairments do not meet or equal in severity one of the listings described in Appendix 1 of the regulations, the ALJ must determine at step four whether the claimant can perform his "past relevant work." Answering this question involves three phases. *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996). First, the ALJ considers all of the relevant medical and other evidence and determines what is "the most [claimant] can still do despite [his physical and mental] limitations." 20 C.F.R. § 404.1545(a)(1). This is called the claimant's residual functional capacity ("RFC"). *Id.* §§ 404.1545(a)(3). Second, the ALJ determines the physical and mental demands of claimant's past work. Third, the ALJ determines whether, given claimant's RFC, the claimant is capable of meeting those demands. A claimant who is capable of returning to past relevant work is not disabled.

> (5) If the claimant does not have the RFC to perform his past relevant work, the Commissioner, at step five, must show that the claimant is able to perform other work in the national economy, considering the claimant's RFC, age, education, and work experience. If the Commissioner is unable to make that showing, the claimant is deemed disabled. If, however, the Commissioner is able to make the required showing, the claimant is deemed not disabled.

*See* 20 C.F.R. § 404.1520(a)(4) (disability insurance benefits); 20 C.F.R. § 416.920(a)(4)

(supplemental security income); *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005);

---

[5] Substantial work activity is work activity that involves doing significant physical or mental activities. 20 C.F.R. §§ 404.1572(a). "Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." *Id.* "Gainful work activity is work activity that you do for pay or profit." 20 C.F.R. §§ 404.1572(b).

*Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005).  The claimant has the initial burden of establishing a disability in the first four steps of this analysis.  *Bowen v. Yuckert*, 482 U.S. 137, 146, n.5, 107 S.Ct. 2287, 2294, n.5, 96 L.Ed.2d 119 (1987).  The burden shifts to the Commissioner at step five to show that the claimant is capable of performing work in the national economy.  *Id.*  A finding that the claimant is disabled or not disabled at any point in the five-step review is conclusive and terminates the analysis.  *Casias v. Sec'y of Health & Human Serv.*, 933 F.2d 799, 801 (10th Cir. 1991).

### B.   <u>Standard of Review</u>

The Court reviews the Commissioner's decision to determine whether the factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied.  42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004).  A decision is based on substantial evidence where it is supported by "relevant evidence [that] a reasonable mind might accept as adequate to support a conclusion."  *Langley*, 373 F.3d at 1118.  A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record[,]"  *Langley*, 373 F.3d at 1118, or if it "constitutes mere conclusion."  *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992).  Therefore, although an ALJ is not required to discuss every piece of evidence, "the record must demonstrate that the ALJ considered all of the evidence," and "the [ALJ's] reasons for finding a claimant not disabled" must be "articulated with sufficient particularity."  *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996).  Further, the decision must "provide this court with a sufficient basis to determine that appropriate legal principles have been followed."  *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005).  In undertaking

its review, the Court may not "reweigh the evidence" or substitute its judgment for that of the agency. *Langley*, 373 F.3d at 1118.

### III. <u>Analysis</u>

The ALJ made his decision that Mr. Vigil was not disabled at step five of the sequential evaluation. Tr. 26-27  The ALJ determined that Mr. Vigil had not engaged in substantial gainful activity since August 20, 2016, his application date. Tr. 18.  He found that Mr. Vigil had severe impairments of degenerative disc disease, hemochromatosis, anxiety disorder, and major depressive disorder. Tr. 18.  The ALJ found a nonsevere impairment of tinnitus. Tr. 19.  The ALJ determined, however, that Mr. Vigil's impairments did not meet or equal in severity any of the listings described in the governing regulations, 20 CFR Part 404, Subpart P, Appendix 1. Tr. 19-21.  Accordingly, the ALJ proceeded to step four and found that Mr. Vigil had the residual functional capacity to

> lift and carry 50 pounds, occasionally and 25 pounds frequently; to sit 6 hours in an 8-hour workday; walk and/or stand 6 hours in an 8-hour workday; to push/pull without limitation except for lift/carry restrictions; to frequently climb ramps and stairs, climb ladders, ropes, and scaffolds, balance, stoop, kneel, crouch, and crawl; and can understand, remember and carry out simple instructions, make simple decisions, attend and concentrate for 2 hours at a time, interact adequately with co-workers and supervisors, and respond appropriately to changes in a routine work setting.

Tr. 21.  The ALJ determined that Mr. Vigil had no past relevant work, but that considering Mr. Vigil's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that he can perform.[6] Tr. 26-27.  The ALJ, therefore, concluded that Mr. Vigil was not disabled. Tr. 27.

---

[6] The vocational expert testified that Mr. Vigil would be able to perform the requirements of representative occupations such as a Dishwasher, DOT 318.687-010, which is performed at the medium exertional level (299,000 jobs in national economy); a Janitor, DOT 381.687-018, which is performed at the medium exertional level with an SVP of 2 (1.3 million jobs in the national economy); and a Hand Packager, DOT 921.587-018, which is performed at the medium exertional level with an SVP of 2 (160,000 jobs in the national economy). Tr. 27.

In support of his Motion, Mr. Vigil argues that (1) the ALJ failed to meaningfully consider consultative examiner Robert Krueger, Ph.D.'s opinion regarding Mr. Vigil's ability to do work-related mental activities; and (2) the ALJ failed to meaningfully consider CNP Cheri M. Cerghizan's opinion regarding Mr. Vigil's ability to do work-related mental activities.  Doc. 28 at 22-23.

For the reasons discussed below, the Court finds that the ALJ failed to properly consider the medical opinion evidence regarding Mr. Vigil's ability to do work-related mental activities. As such, this case requires remand.

A.   **Medical Opinion Evidence Related to Mr. Vigil's Ability To Do Work-Related Mental Activities**

1.   **Robert Krueger, Ph.D.**

On September 2, 2014, Mr. Vigil presented to consultative examiner Robert Krueger, Ph.D., for a psychological evaluation.[7][8]  Tr. 321-24.  Dr. Krueger conducted a "clinical interview with biopsychological history," conducted a mental status exam, administered a Beck Depression Inventory, and reviewed certain documents.  Tr. 321.  Dr. Krueger noted his behavioral observations and mental status exam findings as follows:

> Marcus Vigil is a somewhat lean-built 38-year-old man, who appears to be of Spanish ancestry.  He was casually dressed and was wearing a T-shirt and sweat pants.  He had appropriate grooming and has short hair and a goatee.  He was well oriented and was generally cooperative.  He did not have an ID with him.

---

[7] This evaluation was conducted in connection with a prior application for SSI.  Mr. Vigil inquired at the administrative hearing conducted on August 21, 2018, before ALJ Upshall why he had not been referred for a consultative psychological exam in connection with his current application.  Tr. 66.   ALJ Upshall responded, "Well, the reason I believe was – because of, of the evaluation that was done by Dr. Krueger in connection with your previous claim. And since apparently they felt that that was a good evaluation, they did not feel that it was necessary to have it done again."  Tr. 66-67.

[8] Dr. Krueger noted that he had previously evaluated Mr. Vigil on November 16, 2010, at which time Mr. Vigil's diagnoses were Depressive Disorder NOS and r/o Amnestic Disorder NOS.  Tr. 321.

Mr. Vigil presented as being moderately anxious, and he described having difficulties with anxiety and having possible panic attacks. He noted that he becomes nervous and anxious when out in public. He also reported having difficulties with depression. Mr. Vigil reported having chronic sleep disturbance, poor appetite and weight loss, and said he feels depressed on most days. In order to obtain additional information about his depression Mr. Vigil was administered a Beck Depression Inventory. On the BDI test he obtained a total score of 47. This is a very highly elevated score, which suggests that he is experiencing serious problems with depression now. There was no evidence of hypomania or mania and no particular evidence of a bipolar disorder. Also, there was no evidence of hallucinations of delusional thinking and no particular evidence of a psychosis. Mr. Vigil stated that at times he "sees shadows," but it is doubtful that he would qualify for having any psychotic disorder now. Concerning his communication skills, his speech was fairly clear and was of average rate. Concerning his cognitive functioning, Mr. Vigil generally displayed good verbal skills and said he does not have a history of learning disorders. There was no particular evidence of a major cognitive disorder now.

Tr. 323. Dr. Krueger made Axis I diagnoses of Depressive Disorder NOS, r/o Anxiety Disorder such as Panic Disorder, and Pain Disorder, associated with a general medical condition and psychological factors, severity unspecified. Tr. 323. Dr. Krueger assigned an Axis V GAF Score of 45-55.[9]  *Id.*  Dr. Krueger summarized and recommended as follows:

Mr. Vigil noted that he received a back injury in 2006 and stated that he has experienced severe pain and has had limited movement since then. He described having ongoing symptoms of a pain disorder, which is likely to be further exacerbated by his depression and anxiety. Concerning his emotional functioning, Mr. Vigil did show evidence of having significant depression and obtained a highly elevated score on the Beck Depression Inventory. He described having problems with anxiety and having possible panic attacks, and the possibility of having an anxiety disorder warrants further consideration. Concerning his cognitive

---

[9] The GAF is a subjective determination based on a scale of 100 to 1 of a "clinician's judgment of the individual's overall level of functioning." *Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders* (4th ed. 2000) at 32. A GAF score of 41-50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational or school functioning (e.g., no friends, unable to keep a job). *See Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders* (4th ed. 2000) at 34. *See generally, Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1164 (10th Cir. 2012) (considering GAF scores and expressing "concern" with scores of 46 and 50); *Lee v. Barnhart*, 117 F. App'x 674, 678 (10th Cir. 2004) (unpublished) ("Standing alone, a low GAF score does not necessarily evidence an impairment seriously interfering with a claimant's ability to work . . ." but "[a] GAF score of fifty or less, . . . does suggest an inability to keep a job."). A GAF score of 51-60 indicates moderate symptoms (*e.g.,* flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (*e.g.,* few friends, conflicts with peers or co-workers). *Id.* at 34.

functioning, Mr. Vigil did not appear to qualify for having a major cognitive disorder now. . . .

Overall, Mr. Vigil's level of adaptive functioning appears to have declined somewhat since he previously was evaluated in 2010. Because of chronic pain and reported physical limitations, along with ongoing emotional difficulties with depression and anxiety, Mr. Vigil can be expected to have a mild to moderate impairment with complex instructions, particularly if they involve physical labor. Because of these same factors, he can be expected to have marked impairment with maintaining pace and persistence. In his current condition he can be expected to have marked impairment with adjusting to changes in work environment. Because of ongoing emotional difficulties Mr. Vigil can be expected to have at least moderate impairment in many relationships with coworkers, supervisors, and the general public. In his current condition he can be expected to have marked impairment with traveling to distant places alone. He noted that chronic pain limits his mobility, and he also reported having difficulties with leaving his apartment because of anxiety. Because of chronic pain and reported physical limitations, along with having ongoing emotional difficulties, Mr. Vigil can be expected to have moderate and in some work environments marked impairment with being aware of and reacting appropriately to dangers. His impairments can be expected to last for more than one year. At the present time Mr. Vigil is capable of managing his own financial benefits.

Tr. 324.

The ALJ gave no weight to Dr. Krueger's opinion explaining that it was given prior to the alleged onset of disability and had "limited probative value in assessing the claimant's capacity for work activities during the period in question." Tr. 25.

### 2.   Scott Walker, M.D.

On November 8, 2016, nonexamining State agency psychological consultant Scott Walker, M.D., reviewed the medical evidence record at the initial level of review. Tr. 97-98. Dr. Walker prepared a Psychiatric Review Technique ("PRT")[10] and rated the degree of Mr. Vigil's functional

---

[10] "The psychiatric review technique described in 20 CFR §§ 404.1520a and 416.920a and summarized on the Psychiatric Review Technique Form (PRTF) requires adjudicators to assess an individual's limitations and restrictions from a mental impairment(s) in categories identified in the "paragraph B" and "paragraph C" criteria of the adult mental disorders listings. The adjudicator must remember that the limitations identified in the "paragraph B" and "paragraph C" criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process." SSR 96-8p, 1996 WL 374184, at *4.

limitation in the area of activities of daily living as *mild*; difficulties in maintaining social functioning as *mild*; and difficulties in maintaining concentration, persistence or pace as *mild*. Tr. 98. Dr. Walker did not prepare a Mental Residual Functional Capacity Assessment ("MRFCA").

The ALJ gave Dr. Walker's opinion little weight. Tr. 25.

### 3. CNP Cheri M. Cerghizan

On September 12, 2016, Mr. Vigil presented to CNP Cheri M. Cerghizan for behavioral health evaluation and medication management. Tr. 384-87. Mr. Vigil had been referred by family practitioner Amanda McLaney, Ph.D.[11] *Id.* Mr. Vigil reported problems with worsening anxiety and depression and complained that prescribed medication was not effective. *Id.* CNP Cerghizan noted depression and anxiety on mental status exam and that Mr. Vigil recognized "there is a disorder that needs treatment." *Id.* CNP Cerghizan diagnosed major depressive disorder, single episode moderate. *Id.* She educated Mr. Vigil regarding taking Buspar correctly, increased Celexa, and started Hydroxyzine. *Id.*

CNP Cerghizan saw Mr. Vigil fourteen times from September 12, 2016 through April 6, 2018. Tr. 384-87, 545-46, 561-62, 569-70, 578-79, 602-03, 681-83, 802-04, 804-05, 813-14, 824-25, 837-39, 853-55, 896-97. On October 12, 2016, CNP Cerghizan added a diagnosis of Anxiety Disorder, mixed, and made certain medication adjustments. Tr. 603. On November 1, 2016, CNP Cerghizan assessed that Mr. Vigil presented with ongoing mood dysregulation and frustration in

---

[11] Dr. McLaney initially saw Mr. Vigil on May 31, 2016. Tr. 416-18. Mr. Vigil presented to Dr. McLaney for treatment of chronic pain and depression. *Id.* On mental status exam, Dr. McLaney indicated that Mr. Vigil was upset, anxious, depressed, discouraged, had a negative bias, and was unable to sit due to pain issues. Tr. 417. Dr. McLaney made an Axis I diagnosis of Dysthymic Disorder. *Id.* She recommended continued physical therapy, exercise, anti-depressant medication, psychotherapy, and a neurology referral. Tr. 418. Mr. Vigil saw Dr. McLaney a total of nine times in 2016. Tr. 383-84, 390-91, 394-95, 400-01, 411-12, 416-18, 568-69, 577-78, 606-07. Dr. McLaney consistently indicated on mental status exam that Mr. Vigil was emotional, anxious, irritable, negative, and perseverative regarding somatic complaints. *Id.* On August 2, 2016, Dr. McLaney noted that Mr. Vigil was argumentative and histrionic. Tr. 394. She further noted that "I don't doubt that he has pain issues but think he may have a Somatic Symptom Disorder." *Id.* Dr. McLaney consistently indicated that Mr. Vigil's response to treatment was poor with no change. Tr. 384, 391, 395, 401, 412, 568, 578.

the context of pain issues and multiple somatic complaints.  Tr. 579.  Similarly on December 8, 2016, and February 3, 2017, CNP Cerghizan noted that Mr. Vigil presented with recurrent ongoing major depressive disorder, anxiety disorder, and "maybe PTSD," with mild cognitive issues.  Tr. 545-46, 561-62.  In the latter half of 2017 and into early 2018, CNP Cerghizan indicated in her treatment notes that Mr. Vigil had undergone neuropsychological testing which indicated a diagnosis of malingering.  Tr. 802-04, 804-05, 813-14, 824-25, 837-39, 853-55.  Beginning on July 12, 2017, in addition to malingering, CNP Cerghizan added diagnoses of somatoform disorder and mild cognitive disorder, and questioned diagnoses of factitious disorder or conversion disorder. Tr. 803, 805, 814, 825, 838, 855.  CNP Cerghizan continued treatment with medication and encouraged Mr. Vigil to follow up with psychotherapy.  *Id.*

On April 12, 2017, CNP Cerghizan prepared a *Medical Source Statement: Mental Impairments* on Mr. Vigil's behalf.  Tr. 650-55.  CNP Cerghizan indicated that she had been treating Mr. Vigil every four weeks since September 2016 for thirty minutes.  Tr. 650.  She indicated diagnoses of major depressive disorder and generalized anxiety disorder.  *Id.*  She noted medications she prescribed and indicated clinical findings that Mr. Vigil had cognitive decline related to a head injury, poor memory and retention, anxiety and ongoing depression, hopeless thoughts, and obsessions regarding his health.  *Id.*  She identified Mr. Vigil's signs and symptoms as (1) anhedonia or pervasive loss of interest in almost all activities; (2) decreased energy; (3) feelings of guilt or worthlessness; (4) impairment in impulse control; (5) generalized persistent anxiety; (6) mood disturbance; (7) difficulty thinking or concentrating; (8) persistent disturbances of mood or affect; (9) paranoid thinking or inappropriate suspiciousness; (10) recurrent obsessions or compulsions which are a source of marked distress; (11) emotional withdrawal or isolation; (12) perceptual or thinking disturbances; (13) hallucinations or

delusions; (14) easy distractibility; (15) memory impairment – short, intermediate or long term; and (16) sleep disturbance.  Tr. 651.

CNP Cerghizan assessed that Mr. Vigil had a *limited but satisfactory* ability to (1) sustain an ordinary routine without special supervision, (2) ask simple questions or request assistance, and (3) be aware of normal hazards and take appropriate precautions; *was seriously limited, but not precluded from* (1) maintaining regular attendance and being punctual within customary, usually strict tolerances, and (2) accepting instructions and responding appropriately to changes in a routine work setting; and that Mr. Vigil was *unable to meet competitive standards* in (1) remembering work-like procedures, (2) understanding and remembering very short and simple instructions, (3) carrying out very short and simple instructions, (4) maintaining attention for two hour segments, (5) working in coordination with or in proximity to others without being unduly distracted, (6) making simple work-related decisions, (7) completing a normal workday and workweek without interruptions from psychologically based symptoms, (8) performing at a consistent pace without an unreasonable number and length of rest periods, (9) getting along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, (10) responding appropriately to changes in a routine work setting, and (11) dealing with normal work stress.

The ALJ gave little weight to CNP Cerghizan's assessment.  Tr. 25-26.  He explained that

> [t]he doctor apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported.  Yet, as explained elsewhere in this decision, there exist good reasons for questioning the reliability of the claimant's subjective complaints.  This is especially true, given the claimant's repeatedly normal mental status exams.  The possibility always exists that a provider may express an opinion in an effort to assist a patient with whom he or she sympathizes for one reason or another.  Another reality, which should be mentioned, is that

11

> patients can be quite insistent and demanding in seeking supportive notes or reports from their physician, who might provide such a note in order to satisfy their patients' requests and avoid unnecessary tension.  While it is difficult to confirm the presence of such motives, they are more likely in situations where the opinion in question departs substantially from the rest of the evidence of record, as in the current case.

*Id.*

### 4.   <u>Cathy Simutis, Ph.D.</u>

On June 6, 2017, nonexamining State agency psychological consultant Cathy Simutis, Ph.D., reviewed the medical evidence record at reconsideration.  Tr. 112-13.  Dr. Simutis prepared a PRT and rated the degree of Mr. Vigil's functional limitation in the area of understanding, remembering or applying information as *mild*; in the area of interacting with others as *moderate*; in the area of maintaining concentration, persistent and pace as *moderate*; and in the area of adaptation as *mild*.  *Id.*  Dr. Simutis also prepared a MRFCA in which she found in Section I that Mr. Vigil had *moderate limitations* in his ability to (1) understand and remember detailed instructions; (2) carry out detailed instructions; (3) maintain attention and concentration for extended periods; (4) work in coordination with or in proximity to others without being distracted by them; (5) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and (6) interact appropriately with the general public.  Tr. 116-117.

In Section III, Dr. Simutis assessed that

> the claimant can understand, remember and carry out simple instructions, make simple decisions, attend and concentrate for 2 hours at a time, interact adequately with co-workers and supervisors, and respond appropriately to changes in a routine work setting.

Tr. 117.

The ALJ gave Dr. Simutis's opinion great weight.  Tr. 25.

## B.     Legal Standard

The applicable regulations and case law require an ALJ to consider all medical opinions and discuss the weight assigned to those opinions.[12]  *See* 20 C.F.R. §§ 404.1527(c); *see also Hamlin,* 365 F.3d at 1215 ("[a]n ALJ must evaluate every medical opinion in the record, although the weight given each opinion will vary according to the relationship between the disability claimant and the medical professional.").  "An ALJ must also consider a series of specific factors in determining what weight to give any medical opinion."  *Hamlin*, 365 F.3d at 1215. (citing *Goatcher v. United States Dep't of Health & Human Servs*., 52 F.3d 288, 290 (10th Cir. 1995)).[13]  An ALJ's decision need not expressly apply each of the six relevant factors in deciding what weight to give a medical opinion.  *Oldham v. Astrue*, 509 F3d. 1254, 1258 (10th Cir. 2007).  However, the decision must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinions and reasons for that weight."  *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003).  The ALJ's decision for according weight to medical opinions must be supported by substantial evidence.  *Hackett v. Barnhart*, 395 F.3d 1168, 1174 (10th Cir. 2005).  An ALJ is required to give controlling weight to the opinion of a treating physician if it is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record.  *Id.*  Generally the opinion of a treating physician is given

---

[12] The agency issued new regulations regarding the evaluation of medical source opinions for claims filed on or after March 27, 2017.  *See* "Revisions to Rules Regarding the Evaluation of Medical Evidence," 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017); (Doc. 19 at 4 n.3.).  However, because Mr. Vigil filed his claim on August 20, 2016, the previous regulations for evaluating opinion evidence apply to this matter.  *See* 20 C.F.R. 416.927.

[13] These factors include the examining relationship, treatment relationship, length and frequency of examinations, the degree to which the opinion is supported by relevant evidence, the opinion's consistency with the record as a whole, and whether the opinion is that of a specialist.  *See* 20 C.F.R. § 416.927(c)(2)-(6).

more weight than that of an examining consultant, and the opinion of a non-examining consultant is given the least weight of all. *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004). "If an ALJ intends to rely on a nontreating physician or examiner's opinion, he must explain the weight he is giving to it." *Hamlin*, 365 F.3d at 1215.

Ultimately, the ALJ must give good reasons that are "sufficiently specific to [be] clear to any subsequent reviewers" for the weight that she ultimately assigns the opinion. *Langley*, 373 F.3d at 1119 (citation omitted). Failure to do so constitutes legal error. *See Kerwin v. Astrue*, 244 F. App'x. 880, 884 (10th Cir. 2007) (unpublished). In addition, "[a]n ALJ is not entitled to pick and choose through an uncontradicted medical opinion, taking only the parts that are favorable to a finding of nondisability." *Haga v. Astrue*, 482 F.3d 1205, 1208 (10th Cir. 2007) (citations omitted). Instead, an ALJ "must ... explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." SSR 96-8p, 1996 WL 374184, at *7. Further, the Commissioner may not rationalize the ALJ's decision post hoc, and "[j]udicial review is limited to the reasons stated in the ALJ's decision." *Carpenter v. Astrue*, 537 F.3d 1264, 1267 (10th Cir. 2008) (citation omitted).

The regulations also contemplate the use of information from "other sources," both medical[14] and non-medical,[15] "to show the severity of an individual's impairment(s) and how it affects the individual's ability to function." *Frantz v. Astrue*, 509 F.3d 1299, 1301 (10th Cir.

---

[14] For claims filed before March 27, 2017, other medical sources are defined as nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapists. SSR 06-03p, 2006 WL 2329939, at *2; SSR 96-2p, 2017 WL 3928298.

[15] For claims filed before March 27, 2017, non-medical sources include, but are not limited to, educational personnel, such as school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers; public and private social welfare agency personnel, rehabilitation counselors; and spouses, parents and other caregivers, siblings, other relatives, friends, neighbors, clergy, and employers. SSR 06-03p, 2006 WL 2329939, at *2; SSR 96-2p, 2017 WL 3928298.

2007) (citing 20 C.F.R. §§ 416.902); *see* SSR 06-03p, 2006 WL 2329939, at *2.[16]  "Information from these 'other sources' cannot establish the existence of a medically determinable impairment.  Instead, there must be evidence from an 'acceptable medical source'[17] for this purpose."  SSR 06-03p, 2006 WL 2329939, at *2.[18]  An ALJ is required to explain the weight given to opinions from other medical sources and non-medical sources who have seen a claimant in their professional capacity, "or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case."  *Id.* at *6; *see also Keyes-Zachary v. Astrue,* 695 F.3d 1156, 1163 (10th Cir. 2012) (finding that ALJ was required to explain the amount of weight given to other medical source opinion or sufficiently permit reviewer to follow adjudicator's reasoning).  The weight given to this evidence will vary according to the particular facts of the case, the source of the opinion, the source's qualifications, the issues that the opinion is about, and other factors, *i.e.,* how long the source has known and how frequently the source has seen the individual; how consistent the opinion is with other evidence; the degree to which the source presents relevant evidence to support an opinion; how well the source explains the opinion; whether the source has a specialty or area of expertise related to the individual's impairment; and any other facts that tend to support or refute the opinion.  SSR 06-03p, 2006 WL 2329939, at *4-5.[19]

---

[16] SSR 06-3p is rescinded for claims filed on or after March 27, 2017.  SSR 96-2p, 2017 WL 3928298, at *1.  For claims filed after March 27, 2017, all medical sources can make evidence that are categorized and considered as medical opinions.  *Id.* at *2.

[17] For claims filed before March 27, 2017, "acceptable medical sources" are licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists.  SSR 06-03p, 2006 WL 2329939, at *1; SSR 96-2p, 2017 WL 3928298.

[18] *See* fn. 16, *supra.*

[19] *Id.*

C.    **The ALJ Failed to Apply the Correct Legal Standard in Evaluating CNP Cerghizan's Assessment and His Explanations for Rejecting Her Assessment Are Not Supported by Substantial Evidence**

Mr. Vigil argues that the ALJ's discussion of CNP Cerghizan's opinion "reads more like an indictment of Plaintiff's character and suspicion of the physician's motives than a meaningful discussion of the evidence." Doc. 28 at 23.  The Commissioner contends that the ALJ adequately explained that CNP Cerghizan's opinion was inconsistent with treatment notes and the objective evidence, and that CNP Cerghizan relied heavily on Mr. Vigil's own statements which the ALJ had discounted for legally valid reasons, including evidence of malingering.  Doc. 32 at 10.

The undersigned finds that the ALJ's evaluation of CNP Cerghizan's assessment of Mr. Vigil's ability to do work-related mental activities falls woefully short of that required by the regulations and is not supported by substantial evidence.  To begin, the ALJ broadly cites evidence "explained elsewhere in this decision" that good reasons exist for questioning the reliability of claimant's subjective complaints.  Tr. 25.  However, the ALJ's broad reference to evidence elsewhere in the decision only leads to more broadly cited evidence.  For example, the ALJ states that although Mr. Vigil continued to report anxiety and depression, he "has essentially normal mental status exams (Exhibits B10F, B12F)."  Tr. 24.  Exhibit B10F consists of 109 pages of treatment notes and Exhibit B12F consists of 65 pages of treatment notes.  Tr. 540-648, 656-720.  When discussing Mr. Vigil's history of mental health treatment for anxiety, the ALJ cites "Exhibit B9F."  Tr. 23.  Exhibit B9F consists of 163 pages.  Tr. 377-539.  The ALJ's global references defy meaningful review and certainly do not constitute substantial evidence in support of the Commissioner's disability determination.  *See Langley*, 373 F.3d at 1119

(explaining that the ALJ must give good reasons that are "sufficiently specific to [be] clear to any subsequent reviewers" for the weight assigned to opinion evidence).  Additionally, this court is neither required—nor, indeed, empowered—to parse through the record to find specific support for the ALJ's decision.  *Gutierrez v. Colvin*, 67 F. Supp. 3d 1198, 1203 (D. Colo. 2014).

Additionally, the few isolated treatment notes the ALJ does cite as evidence of normal mental status exams and improved mental health status overlooks probative evidence to the contrary and amounts to picking and choosing among medical reports, which is not allowed.  *See Carpenter v. Astrue*, 537 F.3d 1264, 1265 (10th Cir. 2008) (quotation omitted) ("It is improper for the ALJ to pick and choose among medical reports, using portions of evidence favorable to his position while ignoring other evidence."); *see also Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996) (the record must demonstrate that the ALJ considered all of the evidence and must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects).  For example, Mr. Vigil cites in his Reply, and the Court's review confirms, evidence of numerous mental status exams demonstrating abnormal cognition, mood, insight and judgment, and that Mr. Vigil's mental impairments were worsening with time.[20] Doc. 33 at 5-6.  The ALJ also relies on certain parts of CNP Cerghizan's treatment notes in which she indicated that neuropsychological testing reflected Mr. Vigil was malingering.[21]  Tr. 24.  In relying solely on CNP Cerghizan's notations regarding malingering, however, the ALJ

---

[20] *See also* fn. 11, *supra* (discussing family practitioner Amanda McLaney, Ph.D.'s treatment notes that reflect abnormal mental status exams and poor response to treatment throughout 2016); *see also* Dr. Krueger's psychological evaluation indicating Mr. Vigil's adaptive functioning had declined since previously evaluated in 2010.  Tr. 324.

[21] *See Carter v. Colvin*, 556 F. App'x 523, 525 (7th Cir. 2014) (explaining that "[m]alingering" is defined in the DSM–V as the "intentional production of false or grossly exaggerated physical or psychological symptoms, motivated by external incentives such as avoiding military duty, avoiding work, obtaining financial compensation, evading criminal prosecution, or obtaining drugs." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 726 (5th ed. 2013)).

failed to discuss that CNP Cerghizan consistently diagnosed Mr. Vigil with mood disorder, somatoform disorder[22] and mild cognitive disorder, and questioned the presence of factitious disorder[23] or conversion disorder.[24]  Tr. 803, 805, 814, 825, 838, 855.  The ALJ also failed to

---

[22] A somatoform disorder is defined as a group of disorders in which physical symptoms suggesting physical disorders for which there are no demonstrable organic findings or known physiologic mechanisms, and for which there is positive evidence, or a strong presumption that the symptoms are linked to psychological factors; e.g., hysteria, conversion disorder, hypochondriasis, pain disorder, somatization disorder, body dysmorphic disorder, and Briquet syndrome. *Somatoform disorder*, Stedmans Medical Dictionary; *see also* 20 C.F.R. Pt. 404, Subpt. P, App.1, Listing 12.07 (2016 ed.) (defining "somatoform disorders" as "[p]hysical symptoms for which there are no demonstrable organic findings or known physiological mechanisms."); *Parks v. Sullivan*, 766 F. Supp. 627, 631 (N.D. Ill. 1991) (explaining that "Somatoform Disorder" refers more generally to a group of disorders that includes conversion and somatoform pain disorder (*Diagnostic Manual* at 255):

> The essential features of this group of disorders are physical symptoms suggesting physical disorder (hence, Somatoform) for which there are no demonstrable organic findings or known physiologic mechanisms, and for which there is positive evidence, or a strong presumption, that the symptoms are linked to psychological factors or conflicts. Unlike in Factitious Disorder or Malingering, the symptom production in Somatoform Disorders is not intentional, *i.e.,* the person does not experience the sense of controlling the production of the symptoms. Although the symptoms of Somatoform Disorders are "physical," the specific pathophysiologic processes involved are not demonstrable or understandable by existing laboratory procedures and are conceptualized most clearly by means of psychological constructs. For that reason, these are classified as mental disorders.

*Id.*

[23] *See Sinclair v. Saul*, No. 3:18-CV-00656 (RMS), 2019 WL 3284793, at *14 (D. Conn. July 22, 2019) (explaining that Factitious Disorder, also known as Munchausen's Syndrome, is defined as "a serious mental disorder in which someone deceives others by appearing sick, by purposely getting sick or by self-injury." *Diseases & Conditions*, Mayo Clinic.org, https://www.mayoclinic.org/diseases-conditions/factitious-disorder/symptoms-causes/syc-20356028 (last visited July 9, 2019)) *see also Garcia v. Chater*, 3 F. Supp. 2d 173, 173 (D. Conn. 1998) (explaining that factitious disorder, as defined by the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, is a mental disorder characterized by intentional production or feigning of physical or psychological signs and symptoms, the motivation for which derives not from external incentives, such as a desire to obtain disability benefits, but from a psychological need to assume the role of a sick person. DSM–IV at 471–72. The lack of external incentives for feigning symptoms distinguishes factitious disorder from malingering.).

[24] *See Edgell v. Kijakazi*, No. CV 21-269 KK, 2022 WL 1987846, at *10 (D.N.M. June 6, 2022) (explaining that Conversion Disorder is "a mental condition in which a person has ... nervous system (neurologic) symptoms that cannot be explained by medical evaluation." Medline Plus, "Conversion Disorder," https://medlineplus.gov/ency/article/000954.htm (last accessed June 3, 2022).

> People who have conversion disorder are not making up their symptoms in order to obtain shelter, for example (malingering). They are also not intentionally injuring themselves or lying about their symptoms just to become a patient (factitious disorder). Some health care providers falsely believe that conversion disorder is not a real condition and may tell people that the problem is all in their head. But this condition is real. It causes distress and *cannot be turned on and off at will.*

*Id.* (emphasis added); *see also* Mayo Clinic, "Functional neurologic disorder/conversion disorder," https://www.mayoclinic.org/diseases-conditions/conversion-disorder/symptoms-causes/syc-20355197 (last accessed June 3, 2022) (symptoms of conversion disorder "are real" and patients "can't intentionally produce or control" them).

discuss medical opinion evidence that was consistent with CNP Cerghizan's opinion related to Mr. Vigil's ability to do work-related mental activities.[25]  In sum, the ALJ improperly relied solely on evidence favorable to his position while failing to discuss uncontroverted and probative evidence he chose to reject.  This is error.

The foregoing aside, what is particularly troubling to the undersigned is the ALJ's rank and improper speculation that CNP Cerghizan rendered her opinion in an act of sympathy and in an effort to avoid unnecessary tension with Mr. Vigil.  Tr. 25.  In other words, the ALJ infers that CNP Cerghizan lied in order to help Mr. Vigil collect disability benefits.  This "rationale of inappropriate motives and sympathy" fails to meet the requisite regulatory and Tenth Circuit case law requirements that the ALJ provide good reasons supported by substantial evidence for

---

"Signs and symptoms" of conversion disorder, also referred to as functional neurologic disorder, include "[a]bnormal movement, such as tremors[.]"  https://www.mayoclinic.org/diseases-conditions/conversion-disorder/symptoms-causes/syc-20355197.  Other signs and symptoms of conversion disorder include difficulty walking, loss of balance, episodes of apparent loss of consciousness, vision problems, and cognitive difficulties involving memory and concentration.  *Id.*

[25] The ALJ accorded no weight to consultative examiner Robert Krueger, Ph.D.'s assessment explaining that it was given prior to the alleged onset of disability.  Tr. 25.  The record reflects that Mr. Vigil, who was unrepresented by counsel at both administrative hearings on his current claim, specifically asked ALJ Upshall about obtaining a new psychological consultative exam.  In response, ALJ Upshall made representations to Mr. Vigil that a new consultative exam was unnecessary because "they felt that [Dr. Krueger's] evaluation was a good evaluation [and] they did not feel that it was necessary to have it done again."  Tr. 67.  ALJ Wheeler nonetheless failed to consider Dr. Krueger's opinion at all despite ALJ Upshall's representations to Mr. Vigil.  Notably, Dr. Krueger's opinion was consistent with CNP Cerghizan's assessment with respect to Mr. Vigil's ability to maintain pace and persistence, work in coordination with or in proximity to others, get along with co-workers or peers, and respond appropriately to changes in a routine work setting.  *Compare* Tr. 324, 652.

CNP Cerghizan's opinion was also partially consistent with nonexamining State agency psychological consultant Dr. Simutis's assessment with respect to Mr. Vigil's *moderate limitations* in his ability to maintain attention and concentration for extended periods; work in coordination with or in proximity to others; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and interact with the general public.  Tr. 116-17, 652.  "[A] moderate impairment is not the same as no impairment at all."  *Haga*, 482 F.3d at 1208.  The mental abilities needed to understand, carry out and remember simple instructions and the "mental abilities critical for performing unskilled work" include the ability to "complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods."  POMS § DI 25020.010.  Unlike limitations in a claimant's ability to maintain concentration, POMS § DI 25020.010 emphasizes in regard to this limitation that "[t]hese requirements are usually strict."

rejecting medical opinion evidence and merits no deference. *See Langley*, 373 F.3d at 1121 ("[The ALJ] improperly rejected opinion based on his own speculative conclusion that the report was based only on claimant's subject complaints and was 'an act of courtesy to a patient.'"); *see also McGoffin v. Barnhart*, 288 F.3d 1248, 1252 (10ᵗʰ Cir. 2002) ("[i]In choosing to reject [a] treating physician's assessment, an ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and *not due to his or her own credibility judgments, speculation or lay opinion*.") (internal quotation marks omitted).  Moreover, CNP Cerghizan consistently described Mr. Vigil's mental abnormalities and symptoms and noted her diagnoses and treatment in support of her assessment of Mr. Vigil's ability to do work-related mental activities.  By contrast, there is nothing in the record to support the ALJ's speculation that CNP Cerghizan's assessment is based on anything other than her documented medical findings.

Further, the ALJ's statement is "similar to those [boilerplate statements that other] courts have repeatedly criticized as an improper basis upon which to discount a medical opinion." *Todd v. Comm'r of Soc. Sec.*, No. 3:20-CV-1374, 2021 WL 2535580, at *8 N.D. Ohio June 3, 2021), *report and recommendation adopted*, No. 3:20-CV-1374, 2021 WL 2530846 (N.D. Ohio, June 21, 2021);[26] *see also Rivera v. Berryhill*, No. 17-CV-7177 (RWS), 2019 WL 692162, at *1 (S.D.N.Y. Jan. 28, 2019) (finding the ALJ erred in concluding that medical opinion was based on

---

[26] Citing *Scales v. Comm'r of Soc. Sec.*, No. 1:19-cv-3, 2020 WL 830964, at *13, 2020 U.S. Dist. LEXIS 29280, at *42 (N.D. Ohio Feb. 20, 2020) ("The ALJ's speculation as to a doctor's possible motives for rendering a medical opinion is unsupported and is an impermissible ground for rejecting [the medical] opinion."); *Carney v. Berryhill*, No. 1:16-cv-2136, 2017 WL 2791104, at *9, 2017 U.S. Dist. LEXIS 99311, at *37 (N.D. Ohio June 9, 2017) (While ... it is *possible* that [the medical provider] formed her opinion in order to appease a patient for whom she had sympathy, this Court's review is not guided by what is possible [but] [r]ather ... whether the ALJ's decision is supported by *substantial evidence ... contained in the record*." (emphasis in original); *Soto-Rivera v. Comm'r of Soc. Sec.*, No. 17-cv-6675, 2019 WL 2718236, at *5, 2019 U.S. Dist. LEXIS 109125, at *14 (W.D.N.Y. June 28, 2019) ("This gratuitous finding is not only unsupported anywhere in this record, but also unfairly denigrates the entire medical profession.").

alleged sympathy or desire to avoid doctor-patient tensions and citing cases in which boilerplate

language has been rejected as improper and conclusory by other courts);[27] *Laura B.-F. v.*

*Comm'r of Soc. Sec.*, No. 2:17-CV-146, 2018 WL 9651144, at *7 (D. Vt. June 20, 2018) (finding

that ALJ's comments that physician exaggerated claimant's limitations out of "sympathy" was

improper speculation and contrary to regulations prioritizing treating physician opinions);[28] and

*Briggs v. Colvin*, No. CV415-062, 106 WL 2659554, at *4 (S.D. Ga. May 9, 2016), *report and*

*recommendation adopted*, No. CV415-062, 2016 WL 3129233 (S.D. Ga. June 1, 2016) (finding

the ALJ's reason for only partially crediting medical opinion because it was likely motivated by

sympathy and given in an effort to assist patient was rank speculation and rendered disability

determination reversible).  The *Briggs* court included a noteworthy footnote which states

> [a]pparently, those "boilerplate statements" have infected disability appeals around
> the country.  *See, e.g., Tully v. Colvin*, 943 F. Supp. 2d 1157, 1168 (E.D. Wash.
> 2013) (repeating the same sympathy and tension language as the ALJ used here);
> *Gallegos v. Colvin*, 2016 WL 705227, at *5 (W.D. Tex. Feb. 18, 2016) ("[T]he
> ALJ's statement that it was possible that [healthcare provider] had sympathy for

---

[27] Citing *Oomen v. Berryhill*, No. 16 Civ. 3556, 2017 WL 1386355, at *13 (S.D.N.Y. Apr. 17, 2017) (finding that on remand the ALJ should avoid speculation about the treating provider's motive and offer good reasons before rejecting opinion); *Wade v. Colvin*, No. 3:15 Civ. 47, 2016 WL 1170917, at *8 (D. Conn. Mar. 24, 2016) (finding reasons stated by the ALJ for not crediting the opinions of treating physician "speculative" where the ALJ, using the same phrasing as the ALJ here, had stated "that a doctor may express an opinion in an effort to assist a patient with whom he or she sympathizes" and that some "patients can be quite insistent and demanding in seeking supportive notes or reports from their physicians, who might provide such a note in order to satisfy their patient's requests and avoid unnecessary doctor/patient tension"); *Archambault v. Colvin*, No. 2:15 Civ. 225, 2016 WL 6806230, at *9 (D. Vt. Nov. 17, 2016) (finding that the ALJ's observation regarding patient sympathy and/or tension is speculative and does not constitute a good reason for disregarding medical opinion evidence); *McDowell v. Colvin*, No. 11 Civ. 1132, 2013 WL 1337152, at *8-9 (N.D.N.Y. Mar. 11, 2013) (explaining that the ALJ pointed to absolutely no evidence to support the suggestion that treatment provider might have exaggerated plaintiff's limitations because of plaintiff's pestering and/or to "avoid unnecessary doctor/patient tension"); *Tully v. Colvin*, 943 F. Supp. 2d 1157, 1169-70 (E.D. Wash. 2013) (explaining that "[t]he ALJ's unfounded speculation that a treating physician would lie or exaggerate to assist a patient, without evidence of actual impropriety, is an impermissible assumption in determining Social Security disability cases); *Trujillo v. Astrue*, No. 12 Civ. 89, 2013 WL 706270, at *5 (D. Utah Feb. 26, 2013) (the ALJ's boilerplate statements that treatment provider may have sympathized with the plaintiff and satisfied her requests for an opinion regarding her disability in order to avoid unnecessary doctor-patient tension constitutes improper speculation and inadequate lay opinion judgment by the ALJ).

[28] Citing *Moss v. Astrue*, 555 F.3d 556, 560–61 (7th Cir. 2009) ("An ALJ's conjecture is never a permitted basis for ignoring a treating physician's views, and it is further questionable whether the ALJ's basis for discounting [the treating physician's] medical opinion would be legitimate, even if not speculative." (citations omitted)); *see also Reddick v. Chater*, 157 F.3d 715, 726 (9th Cir. 1998) ("[T]he purpose for which a[ ] [treating physician's] opinion is provided [in a medical report], is not a legitimate basis for evaluating the reliability of the report.").

> Plaintiff or wanted to avoid tension in his relationship with Plaintiff is entirely speculative and constitutes error."); *Lester v .Chater*, 81 F.3d 821, 832 (9th Cir. 1995), as amended (Apr. 9, 1996) ("The Secretary may not assume that doctors routinely lie in order to help their patients collect disability benefits.  While the Secretary may introduce evidence of improprieties, no such evidence exists here.") (quotes and cites omitted).  Unless supported by substantial evidence "which insinuates that [a treating physician] leaned over backwards to support [a p]laintiff's application for disability," such statements have no place in an ALJ's opinion.  *Gallegos*, 2016 WL 705227, at *5.  Using them to undergird benefits denials, as the ALJ did in this case, constitutes error and will not be tolerated.

*Briggs*, 2016 WL 2659554, at 4, n. 7.

The plethora of criticisms from other courts regarding an ALJ's improper reliance on this kind of sympathy and tension statement aside, the Tenth Circuit disapproves of these boilerplate statements as a basis for rejecting treating provider opinion evidence.  As the court aptly explained in *Charboneau v. Astrue*, No. 11 Civ. 547, 2012 WL 5334748 (N.D. Okla. Oct. 26, 2012),

> it has long been the rule in the Tenth Circuit that an ALJ's assertion that a treating physician "naturally advocates" for his patient is not "good cause" to reject treating physician opinions. *Frey v. Bowen,* 816 F.3d 508, 513-15 (10th Cir. 1982).  Instead the Tenth Circuit in *Frey* in 1987 said that such an assertion was a "conclusory statement that contradicts our established legal rule." *Id.* at 515; *see also King v. Barnhart,* 114 F. App'x. 968, 973 (10th Cir. 2004) (boilerplate language asserting opinion was an "act of courtesy" by the treating physician was not a valid reason for rejecting opinion); *Langley v. Barnhart,* 373 F.3d 1116, 1121 (10th Cir. 2004) (same).  *The boilerplate sympathy and tension language used by the ALJ in rejecting the treating provider's medical opinion is similar to the language previously disapproved by the Tenth Circuit in multiple cases.  The Court finds the language used by the ALJ in addressing the opinion evidence of plaintiff's treating provider to be inadequate, improper, and conclusory*.

*Id.* at *6 (emphasis added).

Although CNP Cerghizan is considered an "other source medical provider," an ALJ is still required to explain the weight given "or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case."

SSR 06-03p, 2006 WL 2329939, at *6.  Given the clear regulatory requirements and Tenth Circuit precedent, the Court finds that the ALJ's speculation regarding CNP Cerghizan's motives for preparing an assessment of Mr. Vigil's ability to do work-related mental activities is an improper basis upon which to discount her opinion.  To be clear, the ALJ's use of boilerplate language regarding sympathy and patient tension to discount medical opinion evidence is inadequate, improper, and conclusory, and it will not be tolerated by the Court.

For the foregoing reasons, the Court finds the ALJ failed to apply the correct legal standards in evaluating CNP Cerghizan's opinion and that his reasons for rejecting her assessment of Mr. Vigil's ability to do work-related mental activities are not supported by substantial evidence.  The Court, therefore, recommends that this case be remanded for additional proceedings.

### D.    <u>Remaining Issues</u>

The Court will not address Mr. Vigil's remaining claims of error because they may be affected by the ALJ's treatment of this case on remand.  *Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003).

### IV.  <u>Recommendation</u>

For all of the reasons stated above, the Court finds that Mr. Vigil's Opposed Motion to Reverse and/or Remand (Doc. 28) is well taken and recommends that it be **GRANTED.**

**THE PARTIES ARE NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1).  **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition.  If no objections are filed, no appellate review will be allowed.**

**JOHN F. ROBBENHAAR**
**United States Magistrate Judge**